UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | Case No. 1:19-cv-1414 |
| JUNO LUNA, | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| -vs- | ) | MAGISTRATE JUDGE |
| | ) | CARMEN E. HENDERSON |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Juno Luna, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits under Title II of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the administrative law judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Luna's application for disability insurance benefits be AFFIRMED.

## II.    Procedural History

Luna first applied for disability insurance benefits on August 23, 2014, for a disability period beginning on November 1, 2013. (Tr. of Proceedings before the Social Security Administration, ECF No. 11 at 24). The Ohio Division of Disability Determination (the "State Agency") denied that claim after reconsideration on November 12, 2015. (ECF No. 11 at 24). Luna did not appeal the decision; thus, it became administratively final soon thereafter. (ECF No. 11 at 24).

1

Luna again applied for disability insurance benefits on February 23, 2017, for a disability period beginning on November 1, 2013. (ECF No. 11 at 24). The State Agency initially denied the claim on April 3, and again on reconsideration on May 25. (ECF No. 11 at 24). Luna appealed about a week later. (ECF No. 11 at 24). ALJ Scott Canfield held an administrative hearing the following year, and the ALJ denied Luna's claim in an October 31, 2018 decision. (ECF No. 11 at 24). Luna asked the Social Security Administration appeals council to review the ALJ's decision, but the council denied review on April 19, 2019, rendering the ALJ's decision the Commissioner's final decision. (ECF No. 11 at 5-8). Luna timely filed this action two months later. (ECF No. 1 at 1).

### III.    Background

#### A.    Relevant Medical Evidence

Juno Luna[1] is a 33-year-old female. On November 5, 2015, two years after transitioning from male to female, Luna saw Henry Ng, MD to discuss gender-affirmation therapy. Ng noted that Luna was a good candidate. (ECF No. 11 at 332). Luna reported being abused as a child, having long-term depression, and having no active suicidal ideations. (ECF No. 11 at 332).

On October 24, 2016, Gabriella Feier, MD examined Luna. (ECF No. 11 at 320).  Luna stated to Feier that she

> [i]s unable to take care of herself. She does not have any motivation. Has trouble feeding and dressing herself. States [that] it is a struggle every [] day. Feels low mood, hopeless…. [States] she wakes up anywhere between 7am-1pm. She lives with her friends[,] who also pay for her food. She was on food stamps but could not prove that she could not work. States she cannot work because the depression and anxiety make it difficult for her to work…. Patient states her energy throughout the day is poor and her concentration is very[,] very[,] very poor.

---

[1] Early in her disability-insurance-benefits claim, Luna legally changed her name from Matthew Gagnon to Juno Luna. Thus, both names appear in the administrative record, as does the transitional name Madison Gagnon.

2

(ECF No. 11 at 320). Luna explained that her anxiety was "debilitating," that she "would love to get a haircut but [that] the thought of going somewhere paralyzes her…. She gets panic attacks inconsistently," maybe "a handful a month." (ECF No. 11 at 320). Luna also said that she "has passive thoughts of committing suicide but has no plan." (ECF No. 11 at 320). During Luna's mental-status exam, Feier noted that Luna was cooperative, but got defensive when asked about her ability to concentrate; had an organized, logical thought process; was oriented to time, person, and place; spoke spontaneously, with a normal rate and flow; did not exhibit signs of paranoia, delusions, or perceptual disturbances; was depressed; had a full range affect; had recent and remote memory within normal limits; and had fair judgment and insight. (ECF No. 11 at 322).

On November 2, 2016, Luna saw Brandon Hamm, MD for a psychiatric evaluation. Hamm noted long-term depression, chronic memory issues, short-term forgetfulness and poor recall of her childhood, and long-term social anxiety. (ECF No. 11 at 359). Luna presented with "PTSD, MDD, unspecified anxiety, and avoidant personality traits." (ECF No. 11 at 362). At that time, Luna took Spironolactone and Estradiol; had taken Prozac, Lexapro, Effexor; and she had just started Fluoxetine. (ECF No. 11 at 360).

Luna saw Elizabeth Petitt, NP on January 18, 2017, who noted that Luna had stopped taking Prozac because of its side effects. (ECF No. 11 at 365). Luna explained to Petitt that her appetite and weight were up and down, that she sometimes sleeps well but other times has horrible childhood-abuse flashbacks, and that the "voice[s] in [her] head come and go[] and none of them are happy." (ECF No. 11 at 365). She had scraped her knuckles by repeatedly running "them up and down the wall to feel better." (ECF No. 11 at 365). She promised to "not do anything rash" or "kill or really hurt [her]self" at this time. (ECF No. 11 at 365). Petitt assessed Luna as having a mood disorder. (ECF No. 11 at 366).

The next day, Luna saw Erin Tomlinson, MD and explained that therapy with Vanilda Reyes de Noyes, Licensed Independent Social Worker with Supervision ("LISW-S") was "helpful to a point" and that she was taking two milligrams of aripiprazole daily. (ECF No. 11 at 318). Her gender-affirming hormones had "been super positive in her life," and that she had developed breasts and noted decreased spontaneous erections. (ECF No. 11 at 318). On February 22, 2017, Luna saw Reyes de Noyes, who noted that Luna was well groomed and cooperative; had a logical and organized thought process; maintained tight associations; had good insight and judgment; had within-normal-limits recent and remote memories; was capable of sustained concentration; and was anxious. (ECF No. 11 at 429-30).

On March 8, 2017, Petitt noted that Luna was "stable and safe," despite still being triggered to self-harm by references to the name Matthew. (ECF No. 11 at 374).  Luna saw Reyes de Noyes again on May 3, 2017. (ECF No. 11 at 387). Reyes de Noyes noted a similar mental-examination status as prior visits: spontaneous speech; oriented to time, place, and person; good insight and judgment; logical and organized thoughts; sustained attention and concentration; anxious and depressed moods; within-normal-limits recent and remote memories. (ECF No. 11 at 388).

Clinician Jasmine Chappell met with Luna in her home on May 10, 2017. (ECF No. 11 at 602). Luna had had a bad day and asked Chappell to assist her in going to the grocery store to purchase various necessities. Luna discussed her recent disability-insurance-benefits claim and was hopeful that she would learn the decision soon. (ECF No. 11 at 602). In late July, Luna's mental-status evaluation was largely the same as in recent evaluations. (ECF No. 11 at 450-451).

One week later, Reyes de Noyes noted Luna's dissociative identities. (ECF No. 11 at 455). She noted the following *main* personalities:

- Madison: host, main, feels a lot of the emotion

- Rhonda: non-verbal, takes care of the body

- August: typically speaks for Rhonda

- Violet: doesn't talk much, steps in in stressful situation[s]

- Morgan: mom, outgoing, takes care of everyone

- Autumn: youngest[,] 8-16 years old

- Alice: doesn't come out a lot, [is the] most sexual

(ECF No. 11 at 455). Despite noting these dissociative identities, Reyes de Noyes assessed Luna's mental status as largely unchanged from prior visits. (ECF No. 11 at 456).

In early September, Reyes de Noyes again saw Luna, this time noting that Luna was "Juno now." (ECF No. 11 at 478). She had reduced her self-isolation with positive results but remained depressed. (ECF No. 11 at 479). And Reyes de Noyes noted minor changes to Luna's mental status, notably that her mood was "euthymic." (ECF No. 11 at 479). But on November 7, 2017, Luna reported to Reyes de Noyes that Madison had "retreated, fractured into a bunch [of] pieces." (ECF No. 11 at 528). Luna felt "hopeless, self-negativity, all emotions." (ECF No. 11 at 528). And on November 22, Luna explained that her dissociative identities emerged in the second or third grade. (ECF No. 11 at 534).

In late December, Luna told Reyes de Noyes that she had discontinued her medications and now felt "less clouded." (ECF No. 11 at 555). She still reported memory concerns, a depressed mood, and social anxiety; yet, she planned to attend a party the following week. (ECF No. 11 at 551). And on February 20, 2018, Luna again presented as depressed with passive suicidal ideations. (ECF No. 11 at 753). Her mental status was similar to past assessments, but her mood had reverted to anxious. (ECF No. 11 at 754).

On February 27, Luna explained to Sharon Roesner, Psychiatric Mental Health Nurse Practitioner—Board Certified ("PMHNP-BC"), that she had trouble managing her finances and medications. (ECF No. 11 at 765). Luna was a new patient for Roesner. Roesner noted Luna's self-diagnosed ADHD and history successfully procrastinating school projects. (ECF No. 11 at 765). Luna stated that she often "feels like her head is in a fog and it is becoming worse." (ECF No. 11 at 765). Roesner reported similar mental-status results as had Reyes de Noyes. (ECF No. 11 at 766).

### B.    Relevant Testimonial Evidence

#### 1.    Juno Luna

Luna testified at the hearing. The ALJ and Luna's counsel probed Luna's past work history. Luna recalled working at R.H. Reny, a retail store, in 2004 and 2005. (ECF No. 11 at 49). Luna was a cashier, cleaner, and shelf stocker. She may have worked there about half a year, but she could not accurately say. (ECF No. 11 at 45). She next worked at Rite Aid in 2005, working there longer than at R.H. Remy's, probably about six months. (ECF No. 11 at 49-50). After a short hiatus, Luna next worked for Volt Technical Resources as a technical troubleshooter for an Apple contractor. (ECF No. 11 at 52-53). Luna troubleshooted problems with Apple iPhones and iPods. She started there in 2008 and ended her tenure within six months, when she was laid off unexpectedly. (ECF No. 11 at 53). The job involved no lifting and was performed in a sedentary office setting. After another hiatus, Luna then worked at Sage Advantage as a quality assurance expert in 2010. (ECF No. 11 at 51). She worked there into 2014, reviewing tech support chat services for an outside company. In Luna's words, she "ma[de] sure that overseas support at Symantec was meeting their own quality metrics. So, I would review … tech support chats where

people would … contact Symantec support." (ECF No. 11 at 51-52). The job, too, involved no lifting and was performed in a sedentary office setting. (ECF No. 11 at 52).

Luna also testified about how her various impairments had affected her working life. She explained that she struggled to maintain a full-time job because "the anxiety would get so bad that [she] wouldn't be able to force [her]self out of bed in the morning[] and go to the job…. Eventually, [in] all three of those jobs …, [her] mental health eventually got to the point where [she] was so anxious to go to the job, that [she] would have a panic attack every morning. And eventually, it got so overwhelming that [she] just quit." (ECF No. 11 at 54). She did not remember having panic attacks at any of the workplaces, but she remembered feeling the anxiety and stress at each of the jobs, even those that she held for only a short time. (ECF No. 11 at 54-55). Even while working for long-time employer Sage, Luna "wasn't able to consistently meet any of their metrics. [She] could [adequately perform] for a little bit, maybe like a couple days, or at most a week at a time, but [she] would keep slipping away from being able to meet the quality metrics." (ECF No. 11 at 55). She does not know how she managed to work despite her anxiety. (ECF No. 11 at 62). Her panic attacks always intensified the longer she stayed at a job. (ECF No. 11 at 62). She did not have to interact with many others during her time with Sage, but she still interacted with "the heads of the quality assurance team in India, and that was very stressful for [her to do] over the phone. (ECF No. 11 at 63-64).

Next, Luna discussed her quality of life. She has "withdrawn from society… [She] barely leave[s] [her] room. [She] ha[s] a hard time taking care of [her]self, and doing things like grocery shopping. [She is] unable to do that on [her] own." (ECF No. 11 at 56). Grocery shopping is difficult because she feels anxious being around other shoppers. She leaves the house rarely, usually two times per week, once to attend therapy, and the other to visit one of her three friends

on the weekend. (ECF No. 11 at 56). She watches movies and talks with her friends. She does not eat out at restaurants, although she will occasionally frequent a drive-through restaurant; but even ordering her food over the drive-through's intercom is difficult. (ECF No. 11 at 57). She spends nearly eighty percent of her days inside, and, in the month leading up to the hearing, was in bed for most of that inside-time. (ECF No. 11 at 60).

Luna then discussed some of her diagnoses and treatments. She has a "combined type" of ADHD, which limits her ability to focus, "even on tasks [she] know[s] [she] need[s] to get done." (ECF No. 11 at 57). She has a difficult time remembering to do important life essentials like eating and bathing. If an event occurs on a day other than Tuesday—her group therapy day—she has to set multiple reminders and alarms to remember to attend. (ECF No. 11 at 58). Her group-therapy sessions help her because she can talk with others with similar struggles; but being around other people and sharing her experiences, even in group therapy, still causes her anxiety. (ECF No. 11 at 58). She takes Adderall for her ADHD, and it helps her to focus "to a certain point." (ECF No. 11 at 59). Although Adderall helps, she forgets to take her pill quite often. Sometimes she remembers for a whole week, other times she remembers just once or twice a week. (ECF No. 11 at 59). When she does take it, it helps her "take care of [her]self, feed [her]self, clean, maybe get out for a walk for just a little bit." (ECF No. 11 at 64). But even when she takes it, some days she is "still not able to do any of those things." (ECF No. 11 at 64).

Luna also discussed her living arrangement. She lives with friends and their nine-year-old son. (ECF No. 11 at 58). She lives in a separate addition to the home and does not interact with her housemates frequently. But on Thursdays, she babysits the son for three hours. Luna describes her babysitting duties as "mak[ing] sure the house doesn't burn down." (ECF No. 11 at 59). Her housemates do not charge her rent. (ECF No. 11 at 62).

8

2. Lanell Hall

Vocational expert Lanell Hall also testified at the hearing. She classified Luna's work at Sage as "a checker II, 209.687-010, sedentary, SVP 4, semiskilled, and performed at the sedentary exertion level." (ECF No. 11 at 68). She classified the Volo job as "a user support analyst, 032.262-010, sedentary, SVP 7, skilled, and performed at the sedentary level." (ECF No. 11 at 68).

The ALJ then asked Hall to consider a hypothetical that concerned Luna's past work:

> [I]magine a hypothetical individual with Ms. Luna's vocational profile, who is limited, who has a residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations. The individual is limited to simple, routine tasks, with no strict time demands, no strict production quotas. No more than simple work instructions and decisions, and no more than occasional changes in the work setting. This individual would further be limited to no direct work-related interactions with the public, occasional interaction with supervisors, and occasional and superficial interaction with coworkers. Given those limitations, would the hypothetical individual be able to perform either of Ms. Luna's past jobs?

(ECF No. 11 at 68-69). Hall responded, "No, Your Honor. Past work was at least at the semiskilled level." (ECF No. 11 at 69). The ALJ then asked Hall whether "there would be other jobs existing in the national economy, given the balance of those limitations[,] that the hypothetical individual could perform?" (ECF No. 11 at 69). Hall responded, "Yes, Your Honor, and the following jobs are medium, all SVP 2. Laundry worker II, 361.685-018. 130,000 jobs nationally. A stores, laborer, 922.687-058. 320,000 jobs nationally. And, also a kitchen helper, 344.667-010. 270,000 jobs nationally." (ECF No. 11 at 69). Finally, the ALJ asked if Hall's testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"), to which Hall responded that it was.

Luna then cross-examined Hall. Luna asked two questions. First, whether someone who "[m]ore than 15% of the time [would] be unable to manage regular attendance, and be punctual within customary tolerances," could "maintain or retain employment." (ECF No. 11 at 70). Hall responded, "In my experience, anything more than one day off per month, or more than eight times

per year, would preclude work at the unskilled level. And employers, generally, concentrate on tardiness and leaving early similarly to absences. So, at that rate, yes, that [limitation] would preclude work." (ECF No. 11 at 70). Second, whether someone who would require an isolated work setting could be able to perform any work at the unskilled level. Hall responded, "No. If this person required basic isolation to perform their duties, that would be work preclusive at the unskilled level." (ECF No. 11 at 70-71).

### C.   Relevant Opinion Evidence

#### 1.   Vanilda Reyes de Noyes, LISW-S and Sharon Roesner, PMHNP-BC

Luna's submission included a Mental Impairment Questionnaire completed by Reyes de Noyes and Roesner together with Tomlinson. (ECF No. 11 at 438). Reyes de Noyes and Roesner explained that they had a long-term treatment relationship with Luna dating to August 30, 2016, and that they saw Luna two to four times per month. (ECF No. 11 at 438). They noted her diagnoses: (1) "F44.9 dissociative disorder, unspecified; [(2)] F41.9 unspecified anxiety disorder; [and (3)] F64.0 gender identity disorder." (ECF No. 11 at 438). They described her clinical findings as "[p]atient's mental health functioning is impaired and she has limited ability to effectively manage daily activities," rating her prognosis as "fair." (ECF No. 11 at 438). They noted that Luna's impairments had lasted, or could be expected to last, as least twelve months. (ECF No. 11 at 438).

Reyes de Noyes and Roesner also included a chart that represented Luna's ability to do work-related activities on a day-to-day basis in a regular work setting. These opinions are based on their examinations of Luna:

| Sustained Concentration and Persistence Limitations | Unlimited, Very Good | Limited but Satisfactory | Seriously limited; not precluded | Cannot meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|
| Carry out very short and simple instructions | | | | X | |
| Carry out detailed instructions | | | | | X |
| Maintain attention and concentration—extended | | | | | X |
| Perform activities within a schedule | | | | X | |
| Manage regular attendance; punctuality in customary tolerances | | | | | X |
| Work in coordination with or in proximity to others without being distracted by them | | | | | X |
| Complete a normal workday and workweek without interruptions from psychologically based symptoms | | | | | X |
| Perform at a consistent pace without an unreasonable number and length of rest periods | | | | X | |
| | | | | | |
| **Understanding and Memory Limitations** | Unlimited, Very Good | Limited but Satisfactory | Seriously limited; not precluded | Cannot meet competitive standards | No useful ability to function |
| Remember locations and work-line procedures | | | | | X |
| Understand and remember very short and simple instructions | | | | X | |
| Understand and remember detailed instructions | | | | | X |
| | | | | | |

| Social Interaction Limitations | Unlimited, Very Good | Limited but Satisfactory | Seriously limited; not precluded | Cannot meet competitive standards | No useful ability to function |
|---|---|---|---|---|---|
| Interact appropriately with the general public | | | | | X |
| Ask simple questions or request assistance | | | | X | |
| Accept instructions and respond appropriately to supervisor criticism | | | | | X |
| Get along with peers or coworkers without distracting them or exhibiting extreme behaviors | | | | | X |
| Maintain socially appropriate behavior and adhere to basic standards of neatness, cleanliness | | | | | X |
| **Adaptation Limitations** | Unlimited, Very Good | Limited but Satisfactory | Seriously limited; not precluded | Cannot meet competitive standards | No useful ability to function |
| Respond appropriately to changes in work setting | | | | | X |
| Be aware of normal hazards and take appropriate precautions | | | | X | |
| Set realistic goals or make independent plans | | | | X | |

(ECF No. 11 at 438-39).

Reyes de Noyes and Roesner noted that they anticipated Luna being absent from work "4 out of 5 days" per week because of her impairments. (ECF No. 11 at 439). Finally, they noted that, on average, Luna's symptoms would cause her to be off task at work "80% in 8 hours." (ECF No. 11 at 439).

12

2.      State Agency Initial Review: Cynthia Waggoner, PsyD

Cynthia Waggoner, PsyD, analyzed Luna's claim for the State Agency and reported her findings on March 31, 2017, ultimately finding Luna to be not disabled. (ECF No. 11 at 73-83). Waggoner noted four alleged impairments: (1) PTSD; (2) major depressive disorder; (3) unspecified anxiety; and (4) avoidant personality disorder. (ECF No. 11 at 73). She reviewed Luna's March 31, 2017 function report; medical records from the Center for Families and Children as of March 21, 2017; medical records from MetroHealth as of March 15, 2017; medical records from Spring Harbor Hospital as of March 3, 2017; and medical records from Southern Maine Healthcare as of February 24, 2015. (ECF No. 11 at 74-75). She noted a request for evidence from Luna and determined that a consultative examination was not required. (ECF No. 11 at 75).

Waggoner synthesized the medical records and determined that Luna had the following three severe impairments: (1) depressive, bipolar and related disorders; (2) personality and impulse-control disorders; and (3) anxiety and obsessive-compulsive disorders. (ECF No. 11 at 75-76). She noted that the depressive, bipolar, and related disorder was Luna's primary impairment; her personality and impulse-control disorder was secondary; and her anxiety and obsessive-compulsive disorder was of other priority. (ECF No. 11 at 76). Waggoner noted that Luna's symptoms produce the following four limitations: (i) understanding and memory; (ii) sustained concentration and persistence; (iii) social interaction; and (iv) ability to adapt. (ECF No. 11 at 78). She felt that Luna's description of her symptoms was "partially consistent" "in nature but not severity" with the total medical and non-medical evidence in the file. (ECF No. 11 at 78).

Waggoner addressed Luna's residual functional capacity ("RFC"). She determined that Luna had no memory or understanding limitations. (ECF No. 11 at 79). She determined that Luna had sustained-concentration and persistence limitations, noting that her abilities to "maintain

13

attention and concentration for extended periods of time," "work in coordination with or in proximity to others without being distracted by them," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" were "moderately limited." (ECF No. 11 at 79). All other abilities were either not limited or not significantly limited. (ECF No. 11 at 79).

She also determined that Luna had social-interaction limitations. Luna's "ability to interact appropriately with the general public" was "markedly limited," while her abilities to "ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from supervisors," and "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness" were "moderately limited." (ECF No. 11 at 80). Luna's "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" was "not significantly limited." (ECF No. 11 at 80).

She also concluded that Luna had adaptation limitations. Luna's "ability to respond appropriately to changes in the work setting" was "moderately limited," while her abilities to "be aware of normal hazards and take appropriate precautions," "travel in unfamiliar places or use public transportation," and "set realistic goals or make plans independently of others" were "not significantly limited." (ECF No. 11 at 80). Waggoner ultimately noted that Luna "is able to perform a variety of tasks in an environment in which [she] is not expected to interact [with] the general public or work with others for task completion. There should not be strict or stringent time production quotas." (ECF No. 11 at 80).

For these reasons, Waggoner determined that Luna was not disabled. (ECF No. 11 at 80).

### 3. State Agency Reconsideration Review: Leslie Rudy, PhD

Leslie Rudy, PhD, considered Luna's claim for the State Agency on reconsideration. She reviewed the same medical evidence as Waggoner. (ECF No. 11 at 86-88). She determined that Luna had the same three severe impairments and ordered them by priority in the same manner. (ECF No. 11 at 89). She noted the same four symptoms and concluded that "one or more of [Luna]'s medically determinable impairment[s] … [can] reasonably be expected to produce [her] pain or other symptoms." (ECF No. 11 at 91). She too noted that Luna's "statements about the intensity, persistence, and functionally limiting effects of the symptoms" could not be "sustained by the objective medical evidence alone," and concluded that "the consistency of [Luna]'s statements regarding symptoms" were "partially consistent" in light of "the total medical and non-medical evidence in [the] file." (ECF No. 11 at 91).

Rudy considered Luna's RFC as well. She rated Luna's sustained-concentration and persistence limitations to the same degree as had Waggoner. (ECF No. 11 at 92). She rated Luna's social-interaction limitations the same, too. (ECF No. 11 at 92-93). And she rated Luna's adaptation limitations equally. (ECF No. 11 at 93). This led her to ultimately determine, as had Waggoner, that Luna was not disabled. (ECF No. 11 at 95).

### 4. Luna's Rebuttal Opinion: Mark Heckman

Vocational rehabilitation counselor Mark Heckman submitted an opinion with Luna's rebuttal memorandum. Heckman's opinion restated the ALJ's basic hypothetical limitations: "limited to simple, routine tasks; no strict time demands; no strict production quotas; no more than simple work instructions/decisions; occasional changes in the work setting; no direct work related interaction with the public; and, occasional interaction with supervisors and coworkers." (ECF No. 11 at 255). Heckman noted his disagreement with Hall's opinion, basing it on his "45 years of

experience as a vocational rehabilitation counselor[,] in which [he] performed many job analyses, provided vocational counseling and job replacement to individuals with disabilities, hired and trained rehabilitation counselors and case managers, supervised counselors[,] and owned a case management and rehabilitation company for 20 years." (ECF No. 11 at 255). From that experience, Heckman concluded that "a limitation of occasional interaction with coworkers and supervisors precludes all work[,] as the training and probationary period for any job would require more than occasional interaction (1/3 of the day) with co-workers and supervisors," which, for the jobs that Hall suggested, could last "up to 30 days." (ECF No. 11 at 255). Those thirty days might include "training and supervision … [by] another experienced worker and being coached by that worker (on the job training). Even in positions [that] are considered to be entry level, unskilled, and which exist in sufficient numbers in the national labor market, such as cashier, inspector, sorter, assembler, document preparer, and escort vehicle driver, there would be up to a 30 day training period in which supervision would be frequent (up to 2/3 of the work shift, per the DOT), [which might occur] … in person telephonically, and by electronic means." (ECF No. 11 at 255). Thus, Heckman concluded that "an individual [who] was limited to occasional interaction … would not survive the training/probationary period and would be unemployable in the competitive labor market." (ECF No. 11 at 255).

## IV. The ALJ's Decision

The ALJ's October 31, 2018 decision found that Luna was not disabled and denied her application for disability benefits. (ECF No. 11 at 21-41).

At Step 1, the ALJ found that Luna did not engage in substantial gainful activity from November 13, 2015 (the onset date of her alleged disability) through June 30, 2018 (the date she last met the insured status requirements). (ECF No. 11 at 26-27).

At Step 2, the ALJ found that Luna had the following five severe impairments as detailed at 20 C.F.R. § 404.1520(c): (1) gender dysphoria; (2) depressive disorder; (3) anxiety-related disorder; (4) personality disorder; and (5) attention-deficit hyperactivity disorder. (ECF No. 11 at 27). In reviewing the record, the ALJ also found that had four non-severe impairments: (i) "status post left cubital tunnel decompression and anterior transposition of the ulnar nerve"; (ii) obstructive sleep apnea; (iii) substance abuse; and (iv) occasional marijuana use "once or twice a week." (ECF No. 11 at 21).

At Step 3, the ALJ concluded that Luna did not have any impairment, or combination of impairments, that met or medically equaled the severity of a listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. (ECF No. 11 at 27). In reaching that conclusion, the ALJ considered two sources of medical evidence: (1) mental-impairment questionnaires from Reyes de Noyes and Roesner (only Reyes de Noyes had a long-term treatment relationship with Luna); and (2) the opinions of Waggoner and Rudy, the State Agency's medical consultants, both of whom reviewed Luna's casefile during the claim's early administrative stage. (ECF No. 11 at 27). The ALJ considered that evidence according to Listings 12.04 (depressive, bipolar, and related disorders); 12.06 (anxiety and obsessive-compulsive disorders); 12.08 (personality and impulse-control disorders); and 12.11 (neurodevelopmental disorders). (ECF No. 11 at 27).

The ALJ analyzed Luna's impairments under the criteria at 20 C.F.R. § 404.1520a(c). (ECF No. 11 at 27-28). Those criteria allow an ALJ to assess a claimant's functional limitations, which is "a complex and highly individualized process." 20 C.F.R. § 404.1520a(c). The ALJ must rate the degree to which the functional limitation "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(C)(2). They do so for four core abilities that represent the mental functioning necessary in a work setting:

17

(1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 404.1520a(C)(3). The four abilities are scored on a five-point scale—none, mild, moderate, marked, extreme—to determine the extent to which the impairments limit functioning. 20 C.F.R. § 404.1520a(C)(4). To meet or medically equal the severity of one of the listed impairments, the "mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ scored the four core abilities. (ECF No. 11 at 27-28). The ALJ scored Luna's first ability as *moderate*. (ECF No. 11 at 28). In doing so, he weighed her stated "difficulty remembering generally, understanding what is said to her, following instructions, completing tasks, going to doctor's appointments without reminders, and taking medications without reminders"; her stated ability to "prepare meals, shop, drive, read, … play games," and "provide information about her health, describe her prior work history, respond to questions from medical providers"; as well as a lack of "any mention of any issues with the claimant's short- or long-term memory." (ECF No. 11 at 28). The ALJ scored her second ability as *marked*. He considered her stated "difficulty engaging in social activities, getting along with others, dealing appropriately with authority, and spending time in crowds" against her ability "to shop, spend time with friends and family, and live with others," and medical evidence describing her as "pleasant and cooperative" during appointments. (ECF No. 11 at 28). The ALJ scored Luna's third ability as *moderate*. He balanced her contention that she is "limit[ed] in concentrating generally, following instructions, and completing tasks" against her ability to "drive, prepare meals, watch TV, read, play games, and use the internet," and "the record fail[ing] to show any mention of distractibility." (ECF No. 11 at 28). Finally, the ALJ scored Luna's fourth ability as *moderate*. He considered her "difficulties

18

handling change, dressing, and bathing" against her ability to "care for pets" and evidence showing that she had "appropriate grooming and hygiene, normal mood and affect, and no problems with temper control." (ECF No. 11 at 28).

At Step 4, the ALJ determined Luna's past relevant work within the last fifteen years. (ECF No. 11 at 35). With Hall's input, and the relevant DOT entries as a guide, the ALJ found that Luna had worked as a Checker II (a sedentary, semi-skilled, specific-vocational-preparation role) and a User Support Analyst (a sedentary, skilled role). (ECF No. 11 at 35). The ALJ then found that Luna is unable to perform past relevant work.

At Step 5, the ALJ found that Luna's ability "to perform work at all exertional levels was compromised [only] by nonexertional limitations." (ECF No. 11 at 36). The ALJ relied on Hall's vocational-expert testimony from the June 12, 2018 hearing to conclude that "jobs … existed in significant numbers in the national economy that … [Luna] could have performed," and thus she was not disabled. (ECF No. 11 at 36). Per Hall's assessment, a hypothetical-worker of Luna's age, education, work experience, and RFC would be qualified to work in at least three medium, unskilled occupations in category SVP2: (1) Laundry Worker II; (2) Stores Laborer; and (3) Kitchen Helper. (ECF No. 11 at 36). The ALJ noted that Luna submitted a post-hearing rebuttal opinion from Mark Heckman, a long-time vocational rehabilitation counselor. (ECF No. 11 at 36-37). Heckman "opined that a limitation of occasional interaction with coworkers and supervisors precludes all work[,] as the training and probationary period for any job would require more than occasional interaction … with co-workers and supervisors." (ECF No. 11 at 37). The ALJ explained that he relied on Hall's testimony because it was "consistent with the evidence[, as] it is based on [Hall's] professional experience and … is consistent with the DOT." (ECF No. 11 at 37).

## V.      Law & Analysis

### A.      Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence that a reasonable person "might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support a different result. *Elam*, 348 F.3d at 125. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not

remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold its decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts, for example *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); and *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010), follow *Sarchet*'s logical-bridge requirement because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Luna's Dissociative Identity Disorder

Citing to Reyes de Noyes's and Roesner's medical opinions in the record, Luna argues that her dissociative identity disorder should have been listed with her other five severe impairments. (ECF No. 14 at 4-7). Luna asserts that the ALJ issued "no findings with respect[] to [her] well documented dissociative [identity] disorder." (ECF No. 14 at 3). In her view, if the ALJ had listed it as a severe impairment at Step 2, then the ALJ's Step-5 RFC finding would have been different. (ECF No. 14 at 4-7). The driving force behind this error, says Luna, is the ALJ's decision to credit Reyes de Noyes's and Roesner's medical opinions with "limited weight." (ECF No. 14 at 10-15). Because the ALJ instead credited the State Agency's reviewing experts more, Luna asks the court to remand the claim for additional findings. (ECF No. 14 at 15).

In response, the Commissioner argues that the ALJ properly considered and named all of Luna's severe impairments. (ECF No. 17 at 9). And in the Commissioner's view, even if the ALJ failed to name Luna's dissociative identity disorder a severe or non-severe impairment, such an error is legally harmless. (ECF No. 17 at 9-10). That is so because the ALJ found that Luna had five other severe impairments and, as such, he was required to analyze Luna's claim at Step 3—which he did. (ECF No. 17 at 9-10). What's more, the Commissioner contends that ALJ sufficiently considered the dissociative identity disorder at Step 5; thus, any error did not affect the ALJ's RFC finding, and remand is neither required nor proper. (ECF No. 17 at 9-11).

At Step 2, the ALJ considers whether the claimant has a *severe impairment*. 20 C.F.R. 404.1520(a)(4)(ii), (c). It is a threshold inquiry that is "intended to 'screen out totally baseless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). The Sixth Circuit applies a *de minimus* standard to severe-impairment review; thus, if the impairment has more than a minimal

effect and would be expected to interfere with the claimant's ability to work, then the ALJ must find that the claimant's medically determinable impairment is severe. *See Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985). If the ALJ determines that the claimant has no severe impairments, or no severe combination of impairments, then the ALJ cannot proceed to Step 3 and must find that the claimant is not disabled. 20 C.F.R. § 404.1520(c). But if the ALJ finds even one severe impairment, then the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe" at each subsequent step. *Nejat*, 359 F. App'x at 577. And if the ALJ finds at least one severe impairment and continues the sequential analysis, but incorrectly finds an impairment to be non-severe, then the error may be harmless. *Nejat*, 359 F. App'x at 577.

Luna's argument highlights the link between a Step-2 severity finding and a Step-5 RFC finding: "[F]or a Step Two error to be harmless—and therefore not subject to reversal—the ALJ must have actually considered the cumulative effect of all of the claimant's impairments, severe and not severe, in assessing the claimant's RFC." *Nejat*, 359 F. App'x at 577. Thus, a Step-2 objection necessarily contains an embedded Step-5 RFC objection, and a Step-2 error that leads directly to a Step-5 error is not harmless. *Id.*

One error scenario that compels remand is where the ALJ, after omitting an impairment at Step 2, fails to discuss consider it at a later step. *See, e.g.*, *Katona v. Comm'r of Soc. Sec.*, No. 14–CV–10417, 2015 WL 871617 (E.D. Mich., Feb. 27, 2015) ("While the ALJ devoted a detailed discussion to his evaluation of Plaintiff's mental complaints at Step Two, … the remainder of the ALJ's opinion, including at Steps Three and Four, is devoid of any reference to Plaintiff's alleged mental impairments, suggesting that the ALJ did not consider those impairments while determining Plaintiff's RFC, contrary to what is required under the social security regulations.").

23

Another is where the ALJ improperly characterizes or discounts the relevant evidence. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787-89 (6th Cir. 2009) ("Because the ALJ does not accurately state the evidence used to support his finding, his total discounting of the mental impairment is not supported by substantial evidence.").

### 1.    The ALJ's Personality Disorder Finding

At Step 2, the ALJ found that Luna's "gender dysphoria, depressive disorder, anxiety-related disorder, personality disorder, and attention-deficit hyperactivity disorder" were severe impairments. (ECF No. 11 at 27). Luna contends that the ALJ issued no finding as to her dissociative identity disorder. (ECF No. 14 at 1).

In a literal sense, Luna is correct. The Court concludes, however, that the ALJ intended the phrase *personality disorder* to mean *dissociative identity disorder*. The record supports this conclusion, as the ALJ later referenced in his Steps 3 and 5 analysis that Luna was formally diagnosed with dissociative identity disorder. (ECF No. 11 at 29-35). Additionally, dissociative identity disorder was once called multiple personality disorder.[2] Although Luna listed avoidant personality disorder as an impairment on her disability-benefit-insurance claim (ECF No. 11 at 186), the ALJ wrote nothing about it in his opinion. Thus, it is likely that the ALJ used the generic phrase *personality disorder*—perhaps unartfully—to mean dissociative identity disorder.

---

[2] The Diagnostic and Statistical Manual of Mental Disorders ("DSM") referred to dissociative identity disorder as *multiple personality* in 1980 (DSM-III) and *multiple personality disorder* in 1987 (DSM-III-R), changing to dissociative identity disorder only in 1994 (DSM-IV), which it has retained since. The World Health Organization still refers to dissociative identity disorder as multiple personality disorder in its ICD manual. *Dissociative Identity Disorder (Multiple Personality Disorder)*, TRAUMA DISSOCIATION, http://traumadissociation.com/dissociativeidentitydisorder.html# (last visited Aug. 21, 2020).

But even if the ALJ intended something other than dissociative identity disorder, that omission is subject to harmless-error review. As Luna acknowledges, the ALJ found five severe impairments at Step 2 and proceeded to Step 3, thus satisfying his Step-2 duty. Luna must show, then, that the ALJ failed to consider the omitted impairment when fashioning the RFC.

Luna cannot do so because the ALJ expressly discussed Luna's dissociative identity disorder in determining her RFC. For example, the ALJ detailed an August 2, 2017 report that highlighted Luna's dissociative identity disorder, stating that it "was impact[ing] her situation and mood." (ECF No. 11 at 32). The report examined some of Luna's personalities—Madison, Rhonda, August, Violet, Morgan, Autumn, and Alice. (ECF No. 11 at 32). The ALJ also included a November 8, 2017 report in his findings, which mentions that Luna's "[dissociative identity disorder] symptoms remained but [that] 'Madison' had retreated, fractured into a bunch of pieces," and that "her personalities emerged in the '2nd or 3rd grade." (ECF No. 11 at 32). And the ALJ referenced Reyes de Noyes's and Roesner's dissociative-identity-disorder diagnosis. (ECF No. 11 at 33).

Thus, the ALJ noted and considered the dissociative-identity-disorder diagnosis. Any error, then, is harmless and does not compel remand.

### 2.    The Weight Afforded to Reyes de Noyes's and Roesner's Opinions

Luna argues that the deeper issue, though, is the ALJ's failure to give enough weight to Reyes de Noyes's and Roesner's opinions. (ECF No. 14 at 8-15). Looking to their opinions in the record, Luna points out that "the most obvious work-related limitation caused by [her] dissociative identity disorder would be her dissociating into different personalities while in the workplace in response to her emotions or certain situations." (ECF No. 14 at 7). And as such, "a limitation to simple, routine work with no interaction with the public an[d] occasional interaction with

supervisors and coworkers" "is grossly insufficient[,] given the nature of dissociative identity disorder…" (ECF No. 14 at 7). If the ALJ had credited Reyes de Noyes's and Roesner's opinions more, then—in Luna's view—the ALJ would have adjusted the RFC to fit those extreme symptoms. (ECF No. 14 at 10-12).

As an initial matter, the ALJ correctly characterized Reyes de Noyes's and Roesner's submissions as medical source, but not *treating source*, opinion evidence under 20 C.F.R. § 404.1527. Both parties acknowledge that neither Reyes de Noyes (a licensed clinical social worker) nor Roesner (a psychiatric mental health nurse practitioner) were acceptable medical sources under 20 C.F.R. § 404.1502(a)[3] on the date on which Luna filed her claim. And despite Luna's loose use of the term in her brief (*see generally* ECF No. 14 at 10-15), "treating source" is a term or art that means "your own *acceptable medical source* who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2) (emphasis added). Since neither provider was an acceptable medical source, neither can be a treating source, and neither opinion is entitled to the controlling weight that treating sources receive under 20 C.F.R. § 404.1527(d).

Instead, the ALJ was required to consider Reyes de Noyes's and Roesner's opinions as those from "health care providers who are not acceptable medical sources." Soc. Sec. Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006) (*rescinded by* Recision of Social Security Rulings 96-2p, 96-5p, and 06-03p, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). As Luna points out, such not-acceptable-medical-source evidence is "important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." (ECF

---

[3] As the parties point out, 20 C.F.R. § 404.1502(a) was prospectively amended, effective March 27, 2017, to include as acceptable medical sources "licensed advance practice registered nurses," but it has no bearing here because Luna filed her claim on February 23, 2017.

No. 14 at 9) (citing SSR 06-03p). And an ALJ may give greater weight to a non-acceptable medical source's opinion than he might to an acceptable medical source—even a treating source—based on the unique facts of the case. SSR 06-03p. The Commissioner points out that SSR 06-03p permits, but does not compel, the ALJ to give such great weight to non-acceptable-medical-source evidence. (ECF No. 17 at 12-13).

To satisfy his burden, the ALJ must weigh opinion evidence based on the "facts in each case" and "adjudicate[] [the claim] on its own merits based on a consideration of the probative value of the opinions." SSR 06-03p. The ALJ may consider six guiding factors: (1) the length and frequency of the relationship; (2) the opinion's consistency with other admitted evidence; (3) the opinion's supporting evidence; (4) the opinion's explanation; (5) the provider's specialty or area of expertise related to the individual's impairments; and (6) any other factors that tend to support or refute the opinion. SSR 06-03p. The ALJ need only consider the relevant factors; if he does so, and substantial evidence supports the weight he afforded to the evidence, then the ALJ's weight determination will stand. SSR 06-03p.

The ALJ acted within his *zone of choice* in giving limited weight to Reyes de Noyes's and Roesner's opinion evidence. *Bowen*, 800 F.2d at 545. The ALJ acknowledged Reyes de Noyes's and Roesner's opinions about Luna's dissociative identity disorder. (ECF No. 11 at 33). The ALJ also recognized that Reyes de Noyes, who had been seeing Luna two-to-four times per month since August 30, 2016, had an established, long-term medical relationship with Luna. (ECF No. 11 at 33). But the ALJ weighed the long-term relationships against the other evidence in the record that described Luna's day-to-day functioning. For example, Gabriela Feier, M.D., found in 2016 that Luna was cooperative; oriented to time, person and place; thought logically and in an organized manner; was not paranoid, delusional, or perceptually disturbed; had within-normal-limits memory

27

capacity; and had fair insight and judgment. (ECF No. 11 at 30-31). And the ALJ noted that Reyes de Noyes reported similar findings in March 2017, September 2017, and November 2017. (ECF No. 11 at 31-33). Even Roesner, in her short time with Luna, reported the same in February 2018. (ECF No. 11 at 33).

Ultimately, the ALJ gave "limited weight to [those] opinion[s] because the totality of the mental health evidence does not support such extreme limitations." (ECF No. 11 at 33). Because the long-term relationship and consistency factors appear to be relatively balanced (and the other factors appear to be only minorly relevant), there was sufficient evidence to support giving greater or lesser weight to Reyes de Noyes's and Roesner's opinions than to the State Agency's experts. Though it may have been a close call, it was the ALJ's to make.

Since the ALJ considered and explained the evidence in fashioning Luna's RFC, the Court finds, even if the ALJ did not find Luna's dissociative identity disorder to be severe at Step 2, that such an error would be, at most, harmless.

### C.      Luna's Rebuttal Evidence

Luna's second objection concerns vocational-expert testimony at Step 5 and Luna's post-hearing rebuttal evidence. The objection has two distinct subparts: (1) a procedural due process right to rebut a vocational expert's testimony; and (2) a merits objection to the ALJ's ultimate disability finding. Neither is persuasive.

At Step 5, the ALJ must determine the claimant's RFC. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(v). Then, the ALJ "determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled." *Wilson*, 378 F.3d at 548. At this final step, the claimant no longer bears the burden of

proof; it shifts to the Commissioner, who "must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Wilson* 378 F.3d at 548. The Commissioner takes "administrative notice of 'reliable job information' available from various publications, including the [DOT]." *Zimmerman v. Comm'r of Soc. Sec.*, No. 1:18-cv-1233, 2019 WL 4736267, at *8 (N.D. Ohio, Sept. 27, 2019) (quoting Soc. Sec. Ruling 00-04p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000)). And the Commissioner uses the DOT as its main information source in analyzing the requirements of work in the national economy at Steps 4 and 5. *Zimmerman*, 2019 WL 4736267, at *6 (citing Soc. Sec. Ruling 00-04p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000)).

The ALJ may ask a vocational expert to testify if the case has complex issues or if the ALJ must determine whether the claimant's work skills transfer to other work. 20 C.F.R. § 404.1566(e). ALJs commonly seek vocational-expert testimony; they can rely on their testimony in "identifying specific jobs available in the economy that an individual with the claimant's limitation(s) could perform as substantial evidence supporting an ALJ's finding that the claimant can perform other work." *Zimmerman*, 2019 WL 4736267, at *6 (citing *Wilson*, 378 F.3d at 549)). If the ALJ asks the vocational expert whether there is a "discrepancy between [the expert's] opinion and the DOT requirements for the jobs identified," then the ALJ has complied with agency policy for using a vocational expert. *Zimmerman*, 2019 WL 4736267, at *6 (citing *Beinlich v. Commissioner*, No. 08-4500, 2009 WL 2877930, at *4 (6th Cir. Sept. 9, 2009)). In the Sixth Circuit, "the ALJ is under no obligation to investigate the accuracy of the [vocational expert]'s testimony beyond the inquiry mandated by SSR 00-4p." *Beinlich*, 2009 WL 2877930, at *4. Rather, that "obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the [vocational expert] and bring out any conflicts with the DOT." *Beinlich*, 2009 WL 2877930, at *4.

29

1.      Procedural Right to an Explanation

Eight days after the hearing, Luna submitted an objections memorandum to the ALJ. (ECF No. 11 at 248). There, Luna argued that Hall's in-person vocational-expert testimony was surprise evidence that "could not be reasonably prepared for in advance or, given the complexity of the vocational testimony, responded to immediately, without the ability to consult the vocational source materials relied upon by the vocational expert first." (ECF No. 11 at 248). Luna asked for a supplemental hearing to "present evidence that [she] could not reasonably have anticipated and to which [she wa]s not prepared to respond." (ECF No. 11 at 248). To that end, Luna offered Heckman's rebuttal vocational evidence, which asserted simply that "a limitation of occasional interaction with coworkers and supervisors precludes all work as the training and probationary period for any job would require more than occasional interaction (1/3 of the work day) with co-workers and supervisors." (ECF No. 11 at 255). In Heckman's view, someone with Luna's hypothetical limitations could "not survive the training/probationary period [of SVP 1 or 2 positions] and would be unemployable in the competitive labor market. (ECF No. 11 at 255).

In his written opinion, the ALJ noted the rebuttal opinion and synthesized its substance. (ECF No. 11 at 36-37). But the ALJ abruptly ended his synthesis and declared that Hall had "opined job classifications and job numbers in the national economy based on her experience and consistent with the DOT as required by the Regulations." (ECF No. 11 at 37). Thus, the ALJ signaled that he gave Hall's opinion great weight and little-to-no weight to Heckman's. (ECF No. 11 at 37).

Addressing the procedural objection first, Luna points out that the ALJ was required to consider all of the evidence in the record and rule on it, including Heckman's opinion. (ECF No. 14 at 17). Luna is correct that "the Commissioner of Social Security shall consider all evidence

available in such individual's case record" when determining their disability status. 42 U.S.C. §
423(a)(5)(B). However, despite acknowledging that the ALJ discussed Heckman's opinion, Luna
contends that the ALJ "provided no rationale, let alone a legally sufficient one," for using only
Hall's testimony. (ECF No. 14 at 20). Thus, Luna argues that her "constitutional and statutory
rights to rebut an Agency's witness" were violated. (ECF No. 14 at 18). Further, Luna contends
that her basic rights to present evidence, rebut evidence, and cross-examine witnesses were not
honored because the ALJ did not explicitly explain why he rejected Heckman's rebuttal opinion.
(ECF No. 14 at 18).

In response, the Commissioner points out that the ALJ "need not exhaustively catalog each
argument to issue a proper decision." (ECF No. 17 at 19) (citing *Rivera v. Comm'r of Soc. Sec.*,
No 3:13-cv-772, 2014 WL 4956224, at *5 (N.D. Ohio, Sept. 30, 2014). In the Commissioner's
view, if the ALJ considered the full record in making his decision, then the ALJ is not obligated
to "memorialize every discrete component of the decisional process." (ECF No. 17 at 19-20)
(citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006). The
Commissioner also contends that a party who fails to adequately cross-examine the vocational
expert may waive or forfeit his right to object to her testimony in a post-hearing brief. *E.g.*
*Zimmerman*, 2019 WL 4736267, at *8. The Court agrees with the Commissioner.

The *Zimmerman* case, relied on by the Commissioner, is similar to this case. There,
Zimmerman submitted a post-hearing brief that—according to Zimmerman—the ALJ "did not
acknowledge or address," "despite [Zimmerman's] constitutional and statutory right to have the
objections considered and ruled upon." *Zimmerman*, 2019 WL 4736267, at *7. Zimmerman
argued, in ignoring his post-hearing arguments, that the ALJ did not honor his right to present
evidence, rebut evidence, or cross-examine witnesses. *Id.* But the Court determined that

Zimmerman was given—and availed himself of—the opportunity to present evidence and cross-examine the vocational expert. *Id.* The Court also determined, in failing to adequately cross-examine the vocational expert on the later-rebutted points, that Zimmerman had waived his opportunity to object to the testimony. *Id.* at *8. Ultimately, Zimmerman failed to "provide[] jurisprudence that support[ed] his argument that the ALJ had an obligation to explicitly address his post-hearing objections to the VE's testimony," and the Court found no procedural error that warranted remand. *Id.*

Similarly, in *Kidd*, a claimant submitted a post-hearing memorandum that questioned the vocational expert's opinion and reliance on the allegedly outdated DOT. *Kidd v. Berryhill*, No. 5: 17-cv-420-REW, 2018 WL 3040894, at *3 (E.D. Ky. June 19, 2018). Kidd argued that "the ALJ procedurally erred simply by not 'presenting' [the rebuttal vocational counselor]'s conclusions 'to the vocational expert' who testified." *Id.* at *6 (quoting Kidd's brief). But the District Court found no support for that procedural argument, so it rejected it. *Id.*

Like *Zimmerman* and *Kidd*, there is no support for Luna's procedural objection. Luna did not object to Hall offering her expert opinion. (ECF No. 11 at 67). Luna was given the opportunity to cross-examine Hall, and Luna briefly did so, asking only two questions: (1) whether someone who cannot "manage regular attendance, and be punctual within customary tolerances" "more than 15 [percent] of the time" would be able to maintain or retain employment; and (2) whether someone for whom "working with coworkers or supervisors" is difficult, and who would "require an isolated work setting," would "be able to perform any work at the unskilled level." (ECF No. 11 at 70). And Luna did not object to Hall's answers. (ECF No. 11 at 70).

Additionally, Luna's cases fail to support her assertion that the ALJ's limited discussion of rebuttal vocational evidence on its own requires the Court to remand this case. (ECF No. 14 at

18). Luna cites to thirteen out-of-circuit cases for the proposition that "an ALJ's failure to adequately address, or address at all, objections/challenges to vocational testimony (variously, failure to address challenges based on up-to-date and reliable job information, objections to non-administratively noticed sources for job incidence data, and others)" is error that requires remand. (ECF No. 14 at 18). But these cases are irrelevant to the narrow issue here: whether the ALJ's limited explanation for relying on Hall's opinion was legally sufficient.[4] Luna also cites two cases from the Sixth Circuit: (1) *Cunningham v. Astrue*, 360 F. Appx 606, 615 (6th Cir. 2010); and (2) *Westmoreland v. Berryhill*, No. 3:17-cv-00096, 2018 WL 1522118, at *3-4 (S.D. Ohio Mar. 28, 2018). Similar to the out-of-circuit cases, both concern a different objection—a direct conflict between the DOT and the vocational expert's testimony.

Since Luna fails to properly support her assertion and the Sixth Circuit does not require that an ALJ explain in detail his decision concerning post-hearing vocational-opinion objections, the Court finds no procedural error.

---

[4] For example, *Nunley*, *Ah Pedone*, *Smeed*, *Russell*, *Hancock*, *Thompson*, *Maniscalco*, and *Wright* each concern whether a vocational expert may rely solely on SkillTRAN—a software program that is not listed as a recognized reliable source under the regulations—in offering her opinion testimony.[4] In both *Thomas* and *Prince*, the District Court remanded because claimants' counsel objected to the vocational expert's testimony *during* the hearing. In *Delmonaco*, the District Court remanded because the ALJ failed to follow a provision in the then-current HALLEX—the State Agency's Hearings, Appeals, and Litigation Law Manual—that provided that "if a claimant raises an objection about the VE's opinion, the ALJ must rule on the objection and discuss any ruling in the decision." But that provision was amended in 2016 and HALLEX is now "silent as to post-hearing objections." *Id. Sinclair* concerned an unrelated Step-2 error. And in *Kennedy*, the State Agency's vocational expert was contradictory, testifying that the claimant could not reach overhead, then declaring that the claimant could perform a job that required overhead reaching. (These cases are cited in full at ECF No. 14 at 18, n. 8.)

2.       Relitigating the Vocational Opinion Evidence

Turning next to her merits objection, Luna's "essentially simple point is that the objections memorandum raised facially valid criticisms/concerns about the vocational expert's testimony" that the ALJ did not address. (ECF No. 14 at 23). Luna argues that this error "requires either (1) a showing that the concerns raised are not relevant and/or probative or, if not, (2), *vocational evidence to address a facially valid vocational issue* and resolution of the conflict in the record." (ECF No. 14 at 23 (emphasis in original)). Essentially, Luna believes that the ALJ should have either: (1) explicitly found Heckman's opinion irrelevant; or (2) confronted Hall with Heckman's contrary opinion if it was relevant.

Luna is incorrect. The ALJ was required to consider the opinion, but nothing more. *Kornecky*, 167 F. App'x at 507-08 (stating that the ALJ is not obligated to "memorialize every discrete component of the decisional process"). The record shows that the ALJ considered both Hall's in-person testimony and Heckman's written submission,[5] and concluded that Hall's opinion, which was based on her experience and consistent with the DOT, was more credible. (ECF No. 11

---

[5] Heckman opined that "a limitation of occasional interaction with coworkers and supervisors precludes all work as the training and probationary period for any job would require more than occasional interaction (1/3 of the work day) with co-workers and supervisors." (ECF No. 11 at 255). Heckman's opinion is nearly identical to one submitted by vocational expert Paula Santagati in numerous post-hearing memoranda. *E.g. Kidd*, 2018 WL 3040894, at *4 ("[A] limitation of occasional interaction with coworkers and supervisors precludes all work as the training and probationary period for any job would require more than occasional interaction with co-workers and supervisors."). Santagati's opinion has been repeatedly rejected. It has been called an "extreme, outlier view" (*Kidd*, 2018 WL 3040894, at *11); a non-specific, "form opinion to be used in all cases where any plaintiff has this type of limitation" (*Treadway v. Berryhill*, No. 4:17-cv-1093, 2018 WL 3862106, at *5 (S.D. Tex. Aug. 13, 2018)); and lacking a "'factual basis beyond her own opinion as to why every single job in America requires more than occasional interaction with others.'" *Johnson v. Berryhill*, No. 17-cv-6436P, 2018 WL 4275985, at *12 (W.D. N.Y. Sept. 7, 2018) (quoting *Lara v. Berryhill*, No. B-17-77, 2017 WL 7790109, at *9 (S.D. Tex. Dec. 4, 2017)). As Luna points out, it "is indisputable is that vocational evidence must be reliable…" (ECF No. 14 at 21). In that light, Heckman's conclusory opinion hardly seems reliable.

at 37). Because the "DOT continues to be recognized as a source of reliable job information" (*O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 318 (6th Cir. 2020)), and Hall asserted that her opinion was consistent with it (ECF No. 11 at 69-70), there is substantial evidence to support the ALJ's finding that Luna could perform work that existed in significant numbers in the national economy.

At bottom, Luna asks the Court to choose between competing vocational opinions. Although Luna proclaims that remanding the case to the State Agency for further deliberation will resolve any conflict (ECF No. 14 at 23-24), the Court could do so only if it first substituted its judgment for the ALJ's judgment—put another way, relitigated the vocational evidence—and favored Heckman's take. But that is improper under substantial-evidence review. *Kidd*, 2018 WL 3040894, at *11. Thus, Luna's merits argument is not persuasive.

## VI.  Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Luna's application for disability insurance benefits be AFFIRMED.

DATED: 8/28/2020

___*s/ Carmen E. Henderson*_____
Carmen E. Henderson
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).